Thank you, your honor. May it please the court, I'm Robert Jobe and I'm appearing pro bono today on behalf of the petitioner Jeanise Vrezelien, a Haitian national who was granted asylum in this country in 1993. This case is governed, it's actually controlled by 8 CFR 1208.22, which plainly provides that, quote, any alien who has been granted asylum may not be deported or removed unless his or her asylum status is terminated pursuant to section 208.24 of the regulations. Now, because Mr. Vrezelien was granted asylum based on an application filed before April 1, 1997, under the regulations, his asylum status can be terminated only if he committed an act which would be, which would have been grounds for denial of asylum under section 1208.13c2 of the regs, or he, quote, no longer has a well-founded fear of persecution due to a change in country conditions. What about his attempted assault conviction? Well, your honor, actually, it's not sufficient to terminate his asylum status, and that's what's interesting about this case, and that's what seems to have been missed below over and over and over again. That's why we're here. Although it's sort of implicit throughout this proceeding, no one's really discussing the regulation, is that in order to terminate Mr. Vrezelien's asylum status, the government has to demonstrate that he no longer has a well-founded fear of persecution. Now, what do we do with the fact that he had been granted a lawful resident status? It's irrelevant, because the regulation I don't understand why it's completely irrelevant. Well, the regulation is framed like this, your honor. It says, any alien who has been granted asylum. It's not, you're continuing to maintain asylum status, but if you look, if you were to Google and pull up recent press releases from the Department of Homeland Security about the right to travel for asylees, you'd find that even in their press releases, they continue to say that if you're a permanent resident, but you got your asylum through asylum status, you're also, you continue to be an asylee. And a permanent resident can have his asylum status terminated, even though he's a permanent resident. It doesn't matter. And the regulation makes that clear by talking about any alien who has been granted asylum. You know, we addressed this issue, I forget the name of the case, but didn't we address this? No, you addressed a related issue, but a very different issue, in a case called Kaganovich. Yes. This related issue, third circuit case is the leading case on that. It's called Smrico. Yes. But that case involved refugees. It didn't involve asylees. And in that context, the court made clear, in Kaganovich, the court said that the petitioner is unable to point to any provision of the statute or any other provision of law that unambiguously bars the removal of refugees. This is totally different. I mean, in cases where we're dealing with refugees, we've always lost that argument. Asylees, it's a totally different situation because the reg is crystal clear. The regulation says that an alien who's been granted asylum may not be deported or removed unless his asylum status is terminated pursuant to HCFR 208.24. And 208.24 is very explicit about what allows for termination. Termination is permissible when the person's been firmly resettled, when the person's been convicted of an aggravated felony, a particularly serious crime, or when country conditions have so changed that he no longer has a well-founded fear. That's what we're dealing with here. The issue is, have country conditions changed so that he no longer has a well-founded fear? And the critical issue in that respect is, who has the burden of proof? Now, the immigration judge, the decisions of the immigration judge in this case, they're somewhat unsatisfactory. But at this critical point, he was exactly right. He said, and this is on page 999 of the administrative record, In this case, there has already been a finding by the immigration service that Mr. Brasileon has a well-founded fear of persecution or had a well-founded fear of persecution, and therefore the burden shifts to the government to show a change in circumstances in his country so that this well-founded fear is no longer in place. But that's not what you're arguing. Right. You're not arguing that that would be sufficient. Pardon me? You're not arguing that that would be sufficient. I think that – To change circumstances that he – Yes. I think if the government had come forward and demonstrated that conditions in Haiti had so dramatically changed that he no longer had a well-founded fear of persecution, then they could have terminated his asylum status, and then the issue of his disability would have been at play. Because he would then no longer have a warrant.  He would no longer be an asylee. He'd just be a permanent resident. He would lose his additional status as an asylee, and then that ground of inadmissibility would apply to him. So asylum gives him a leg up on – Right. Exactly. The regs are clear on it. Asylum gives him a leg up. Because generally for asylees, the grounds of inadmissibility, they don't apply at all. For asylees to be ineligible for asylum, you have to do something much more egregious than commit a crime involving moral turpitude. Thanks. First of all, the government claims that this issue wasn't in question. Right. So what's your response? On the exhaustion issue, I strongly would disagree with that. Because, again, this was a central focus of the immigration judge's decision. Not that the regulation wasn't, but the notion that his prior asylum precluded – shifted a burden was. Right. Exactly. And that, to me, is the critical – The fact that the regulation itself wasn't mentioned, you'd say, is an argument, but it's not an issue. They didn't cite the regulation. The judge didn't cite the regulation. Mr. Bresignon's pro bono counsel didn't cite the regulation. But the issue was clearly raised about who has the burden. But doesn't that suggest that we would have to remand him? I don't think so. No guidance from the agency on this. Well, I want to – It's a complicated question for several reasons. See, I personally don't think it's a complicated question at all. And I want to come back to that. I think there are two distinct issues. One, was the issue raised below? I think it was. It was raised clearly by the immigration judge. And it was raised by Mr. Bresignon's pro bono counsel in their brief to the BIA. And that's at page – Not this regulation. They didn't cite the regulation. But they clearly said that because he's an asylee, the burden rests with the government. And that's on page 915 of the administrative record. No, excuse me. That's at page 944 of the administrative record. It's quite complicated. Let's say, for example, ordinarily asylum is discretionary. Right. And it could be denied on the grounds that the person has committed a crime of moral turpitude. Right. Which is not one that would make him ineligible. Right. Can they do that again now? No. Why? Because the regulations don't allow for termination in the exercise of discretion like that. You know, under the regulations, asylum has to be terminated pursuant to 8 CFR 1208.13C2. And that regulation outlines various methods to terminate, but it's an exhaustive list. And to terminate, you have to demonstrate for, in terms of a conviction, either the crime that the person was convicted of was an aggravated felony or it rises to the level of a particularly serious crime. Where is that coming from, by the way? Is that the aggravated felony and a particularly serious crime in the regulation? Yes. It's cross-referenced to 208.13. Right. Exactly. Right. Yeah. Now, the issue that the government's raising is not — is a distinct issue of whether the issue was raised below. Their position is because the Board of Immigration Appeals didn't address the question explicitly, this case has to be remanded back. And I disagree with that. I mean, the issue raised below was, you know, by the immigration judge, who has the burden of proof? The judge said the government does. The board rejected that and clearly said that the alien, Mr. Brazilian, has the burden of proof. The burden of proof and what the burden of proof is are not the same thing. And for example, in my example, who has the burden of proof presumably would not preclude a discretionary denial of asylum if you were viewing it as ab initio. But your theory would preclude. But I don't think anybody's ever argued here that discretion is a factor. Ultimately, the issue that's been at play throughout these proceedings is does he or does he not continue to have a well-founded fear. And it's on that question that we have a disagreement about who has the burden of proof. Now, this issue about whether Ventura and Thomas requires remand, I strongly disagree that remand is required here for I got six different reasons. I mean, first, you know, the regulation in our view is plain and it's absolutely unambiguous. Can I ask another question? Yes. Where – is there case law saying that the burden of proof under the statute of limitations, as you say it is – it's not crystal clear on the statute there. In the termination proceeding, Your Honor, the only cases that have addressed that are cases out of the Eighth Circuit. And, yeah, they hold that consistent with the regulations that the government has the burden of proof demonstrating a ground for termination by a preponderance of the evidence. And that's also what the regulations say. So in your view of this case, how should this case have proceeded to begin with? This guy's – this is a man who's been detained for five years. He's not even removable. His crime renders him inadmissible. But under the regulations, that's not enough because he's an asylee. They first have to terminate his status. So that's what I mean. So they should have instituted proceedings to terminate his asylum status? Right. Under the regulations, they can do that in a removal proceeding. They're supposed to issue a notice of intent to terminate. And arguably, the notice to appear is a notice of intent to terminate. But before they can push forward here, they have to terminate his asylum status. Making him inadmissible, that's just not – it's not enough. If you look at Section 1208.24 of the regulations, that instructs the Department of Homeland Security to commence removal proceedings against an applicant for admission who had been previously granted asylum, but only if the alien falls within the conditions set forth in Section 208.24, the termination regulations, and – it says and – the alien is inadmissible. You need both. When somebody's been granted asylum, it's not enough to be inadmissible. You've got to also be subject to termination. And that's an issue that, for whatever reason, the government never explicitly addressed. It's sort of been in the background here, because you can terminate if Mr. Brazilian no longer has a well-funded fear. But that raises that whole burden of proof question. And on the burden of proof, we think the regulations are crystal clear, and we think that constitutionally it would be crystal clear that burden rests with the government. Kagan. Why doesn't the fact that he actually has legal residence status become relevant, too? Because presumably, if he had legal residence status, could you – could you terminate his – his – that status because he no longer has a well-fed affair if he hadn't done – if he hadn't done anything else? Could you simply come in and say we're going to terminate your legal residence status because you no longer have a well-fed affair? Or once he gets the legal residence status, does the underlying fact that he got it through asylum not matter anymore? Right. The way it works, typically, the way it's supposed to work, is if you've got – if you've got your lawful permanent residence status through asylum and you're charged with inadmissibility, before they can proceed, they've got to terminate this status. No, I'm not asking you that. I'm asking you could you simply come in at that point and say we're going to terminate your asylum status because you no longer have a well-founded fear of – because of a change of country condition. That wouldn't terminate his legal residence status, right? No, it wouldn't terminate his legal residence status. So the fact that he has legal residence status does make him different than somebody who is just an asylee. Yes, absolutely. It gives him an added level of protection. But you're saying that even if that disappears, he's – he's back to his asylum protection? If his permanent residence status disappears? Well, they're not going to be able to terminate his – his permanent residence status unless they first terminate his asylum status. It's sort of a threshold issue because his status as a permanent resident There's certain crimes that automatically terminate your legal residence status. Not for somebody who got their status as an asylee. No. Really? No. I mean, when somebody's been granted status, lawful permanent residence status, after having been granted asylum, the threshold issue is can we take away your asylum status? If we can take away your asylum status, then you're subject to any ground of inadmissibility or deportability that everybody else would be subject to. But the threshold issue is can we terminate your asylum status? Because asylees, they have a heightened level of protection. And they can't be deported, as we were saying, for just any crime involving moral turpitude. That's not enough to take away your asylum status. To be deportable, an asylee has to have committed something that's particularly serious or an aggravated felony. So just taking this issue, what's your – what's your bottom line position? What are you asking us to do? Well, I think that the court should decide this question in the first instance because this guy's been detained for five years. We think the regulations are absolutely clear. They're unambiguous. The issue was clearly raised below by both the immigration judge and counsel for Mr. Brazilian. To the extent the Board of Immigration Appeals misread or misconstrued the IJ's decision, DHS invited it to do so. And if you look at the brief that they filed, now the government admits. They're coming forward and they're saying, we concede that the BIA misread the IJ's decision. Well, they did so at the invitation of DHS. Because if you look at the brief that DHS filed, and this is set forth at pages 935 and 936, the language of the BIA decision parrots DHS's brief. DHS said, despite the absence of corroborating evidence that the department previously granted respondent asylum based on a finding of past persecution, the immigration court nonetheless ruled that respondent enjoyed a presumption of past persecution. The judge didn't say that. The government admits now he didn't say that. But that's how the BIA construed the decision. They did so because DHS invited the heir. In reaching this decision, the court determined that a finding of past persecution had already been established. Again, the judge didn't say that. DHS misconstrued the decision. They got the board. They suckered the board. The board then misconstrued the decision, if you believe the government. And now five years, four years later, and this guy's been in custody for this four-year period, the government's here saying, well, you should remand it back so that the BIA can address this issue in the first instance. They didn't address it to the extent they didn't address it. It's because DHS invited them not to address it. And as a result, this guy's been in custody for the last four years. And he's not even deportable. But the not even deportable really does have an exhaustion problem, unfortunately. When I say, yeah, I agree with that, Your Honor. I think that's a weakness in our position. But in terms of deportability, what I mean by that at this point is that he's not deportable unless his asylum status is terminated. He may be inadmissible in the sense that he's committed a crime involving moral turpitude. But under the regulations, because he's an asylum, it's not enough to prevent him from returning to his home. So he's not removable in that sense. So it's our view that you should decide this issue. You know, four years of custody is too long for this guy. The Immigration Service put themselves in this position in asking the board not to rule on this question and was there four years. Did they ever ask the district director or somebody to grant him bail or something, letting him out? There was a habeas filed. He filed a pro se habeas. The district court just like two weeks ago ordered that he receive a bond hearing within the next 60 days. So he's hopefully going to get a bond hearing in the next 60 days. And the reason he's been detained for so long is because the IJ keeps saying that he should get relief. Right, and the BIA keeps reversing. I want to address a couple other quick issues here, because I think that there are two other or maybe three other issues that the court could address. Pardon me? Is this whole sequence unusual? I've never seen it before. Because this case just went way awry. It normally doesn't play out this way, at least in San Francisco. And when we're dealing with an asylee, the threshold question is can you terminate? Here, this is an Eloy case. It just went off the charts. It's just way out of line. And as a result, this guy's been suffering for five years. On the issue of fact-finding, I want to focus in on the issue of the murder of Mr. Bresilhon's two brothers. The government concedes that it's up to the immigration judge to determine, quote, what happened to an individual in the past and that the board then reviews that determination for clear error. But in this case, the immigration judge accepted as true Mr. Bresilhon's testimony that his two brothers were murdered in 1998 by Tonton Macoutes. And this is at page 996 of the decision. He says, in 1998, his two brothers were killed reportedly by Tonton Macoutes. That's an issue about what happened in the past. The BIA just displaced that factual finding. They didn't believe that the two brothers had been killed for political reasons by Tonton Macoutes. This is at page 914, 915. They say the death of his two brothers was not proved to be tied to their political opinion in any way. Whoever it was who allegedly killed them was not adequately explained. But Tonton Macoutes, whom he accused of the crime, had been long disbanded. In addition, the source of the record. Is there anything in the record to support that? No. No, there's not. But my point is that this is an issue about what happened in the past. Who killed the two brothers? The BIA, the judge said it was the Tonton Macoutes. Well, he didn't. He said it was reportedly the Tonton Macoutes. Right. But he didn't quibble with the reliability of that report. The BIA said the source of this information about their deaths, an unnamed person who talked to the mother, was not necessarily reliable. Well, they don't get to do that. They don't get to make that judgment. The judge decided it was the Tonton Macoutes, and now the BIA is saying, well, that report is not necessarily reliable. They displaced the BIA or the immigration judge's role as fact finder, and that was air. Is that the only place in the record where they did that? In terms of past stuff, yeah. The other issue about, you know, whether he could relocate. Where else did they engage in improper fact finding? I think that's the principal one. The other issue about whether he would be recognized as an RSD affiliate or whether he would be persecuted in other parts of the country, that's a more difficult question. It's future oriented. It's future oriented. But the critical thing on that point, Your Honor, is that if you look at the board's decision in matter of DIM, the government cited two cases in its 28-J letter, but it left out DIM, a 2008 case where the BIA said, because it has limited fact finding abilities in deciding appeals, it would remand to an immigration judge for a determination as to whether the applicant in that case could avoid persecution by relocating to Kenya. It's the exact same issue here. And in DIM this year in a published decision, the BIA found it appropriate to remand. So with that issue of relocation, I think we should remand so that the board can sort of reconcile its own cases because the two cases cited by the government seem inconsistent with DIM. Now, on the issue of waiver, because I'm running out of time here, I'm talking really fast, but on the issue of waiver, the government keeps saying that some of these issues should have been raised in the second or third appeal that were brought to the Board of Immigration Appeals. That's wrong. I mean, I'm not saying that Mr. Brazell Young couldn't have raised these issues. The issue, though, in terms of exhaustion is, did he – was that a remedy available as of right? Now, essentially what the government's – Kagan. You're talking abstractly now. What is it you're talking about? Well, here's – the government's saying, well, you disagreed with what the BIA said, for example, in its first decision when they displaced the IJ's conclusion that it was the Tantan Makutsu who had murdered the brother. And they say, well, you should have raised that issue the second time that you appealed to the BIA, and failing to do so, you failed to exhaust administrative remedies as of right. Raised what issue? The question of what? The issue of how the BIA had engaged in improper fact-finding. Oh, I see. Raised it back to the BIA. Right. That's their view. Our view is that what that really would be is an untimely motion to the BIA to reconsider its earlier decision. Obviously, the statute only gives an alien 30 days in which to make a motion to reconsider a decision by the BIA. Now, by the time that second appeal came about, that 30 days had long since passed. That's not to mean that the BIA couldn't consider the issue, because it can. Under certain circumstances, it will. But we don't have the right to ask them to reconsider it. It's a request. We could.  We could. We could. Exactly. You could ask them, but they don't have to entertain that request. And, therefore, it's not a remedy. It's a request. Exactly. That's all it is. They can respond to their own authority to reconsider. Right. Exactly. So it's not a remedy available as of right. And so you have to reject that issue about exhaustion. I have a lot more to say, but I guess I'm out of time. You have a minute for rebuttal. Thank you. Good morning again, Your Honors, and may it please the Court. My name is Jonathan Robbins. I'm here on behalf of Michael Mukasey. We obviously have a long procedural history here. It's been to the Board and to the immigration judge a number of times. And the Attorney General, in his discretion, has created this system whereby both the government and the alien can make appeals about certain issues. And in this case, that was done to a large extent. I mean, we've got this long history. And, you know, this brings up the issue of exhaustion because, really, there's two main issues the Court has to deal with. First, was the Board in its final decision in error? And I think the answer is a pretty resounding no, and I'll talk about that in a moment. But then you've got all these new arguments that are being raised for the first time in the petitioner's brief that aren't properly entertained by the Court. Well, is this regulatory one one of them? I'm sorry, excuse me? Is this question of the burden of proof with regard to the asylum question one of them? There was an issue raised all the way through about the termination of asylum and the way it relates to removal proceedings. No, that was not properly raised. I mean, this requires an interpretation of two of the Board's regulations and the interplay between those two regulations. This Court doesn't have the authority to interpret those regulations before the Board does. The Board has to have an opportunity to interpret those regulations. That would call for a remand, but it wouldn't say there wasn't exhaustion. Well, he never raised the issue that his – this thing – He had what you call the issue. He certainly all along contended that you couldn't – that because he had gotten asylum before, the burden was on the government, not him, to demonstrate changed country conditions, right? That he argued all along. Let me be clear. We're conflating the two issues of burden of proof and termination of asylum proceedings here. He never mentioned that – I understand that, but I was going to go on for a minute. I mean, do you agree that that issue was raised, the burden of proof issue? With respect to which burden of proof? With respect to his showing of a well-founded fear of future persecution? Yes. All right. Now he's saying, well, this is why I had – you had that burden. The reason is because this regulation says that I'm still entitled to asylum unless you meet that burden. So he's basically providing an argument in support of a position that he's taken – an issue that he's raised all along. No, no, no. This is a distinct issue. It's one thing to say that I have – okay. It's made confusing because of the immigration judge's first decision and the board's decision interpreting that. But on the second round of decisions, the immigration clarified exactly what his position was. He says, I'm making an independent finding of past persecution, and I'm not basing this on the prior grant of asylum in 1993. So that takes out of the equation the whole termination of asylum. The board said it had to do that. What? Excuse me, what? The board had already said he had to do that, right? The board had said he couldn't – had said that in terms of the burden, that the fact of the prior asylum didn't matter. The board's decision was – looks like it was based on a misunderstanding of the immigration judge because the immigration judge hadn't been clear. So the immigration judge clarified and said, this is not based on the 1993 grant of asylum. This is based solely on an independent finding of past persecution. There is no argument outside of that that says, wait a second, my proceedings weren't terminated. You know, I shouldn't even be here in the first place. I mean, there was numerous opportunity to raise this. I mean, like I said, there's an extensive procedure here. You know, this has been to the board three times. Nowhere except for the first instance before this Court was this issue raised. And this requires interpretation by the board. So even if it isn't exhausted, it really has to go back down to the board so they can interpret their own regulations. I mean, that's SEC chainery. You know, and then there's a determination as to whether or not that interpretation is entitled to deference. The board's never addressed this issue. Is that what you're saying? No. You know, all throughout this morning I had a continuing concern about who has an obligation to find out what's happening in these foreign countries. I presume in this instance you're saying that if the Petitioner wanted to say anything about the government of Haiti now, he would have. But what I want to say, and that was his burden. But what I think you ought to understand, and I don't think anybody bothered to think about it or look at it, is that as I get it, what has happened here factually is that after a street got deposed and today, his right-hand man is now the leader. So the likelihood is that this fellow would be welcomed with open arms. Does anybody ever look at that aspect of what's going on? Well, in order to present new evidence of change in country conditions, whichever either the government or the alien would at some point have to either make a motion to reopen based on changed country conditions or something along the like to present that new evidence. He wants to go back, and he's on his way, more or less. Technically, under the Immigration and Nationality Act, the case in the Court of Appeals can only be decided on the evidence that's in the administrative record. No, but I'm interested in the DIA role, which is what I was interested in throughout this morning, and whether they ever do anything independently, or the I.J. about looking at what's happening. Immigration judge can — State Department releases, I presume. Immigration judge can make new fact — can present evidence on his own to develop the record, as far as I understand. But the Board cannot, as far as I know. Never has it here, I gather. Right. Let me just go back to this argument about exhaustion and the fact that the Board hasn't yet addressed this particular issue. Do you agree with his argument about how these regulations should work, putting aside the technicals? Do I personally agree? Ask him personally. I mean, you know, just — I don't think so, because it seems to me that if you've been through all these proceedings, which are specifically addressing this, that it's sort of implicit that your prior grant has been terminated. But I can make that decision. That's something that the Board has to come to on its own. I mean, my interpretation of it is — But I gather you don't think his argument is totally off base. Well, I don't. And we talk about this, you know, with respect to the refugee stat, the termination where the Board in those cases — you know, not this circuit, but I think you mentioned the Third Circuit — where they determined, well, no, you don't have to have this prior grant termination. But ultimately, the Court shouldn't really consider that. It's not appropriate. It has to go back down to the — I understand that. I'm just trying to understand how it all works. And again, without being exhausted, it's not properly — I understand that. But I'm just trying to understand how these procedures operate. I mean, we're not there on sort of the ground floor watching how all these things unfold. Well, and again, there's another argument with respect — you know, I know I'm hammering exhaustion hard. I'm not trying to hide behind exhaustion here. But there's this other argument in here with respect to the Board's standard of review where he — he's making two separate arguments, okay? In the prior proceedings, before he's come before this Court, what they said is the Board weighed the evidence incorrectly. We don't think they should have weighed it this way. Now what he's arguing is that they didn't have the authority to make the findings that they did. Now, in the 28-J letter, in matter of ASB and VK, you know, I — you know, I submitted those cases because the Board has recently come to a determination on what its standard of review is and how it can weigh evidence based on undisputed facts. But again, that's not an issue that's really properly brought before this Court. First of all, it wasn't exhaustive. He complained at some point, I guess one of his appellate briefs, that he — No, no, no. — that they engaged in improper fact-finding. No, no, no. What he said — no, he brought that before this Court for the first time. In one of his appellate — in one of his briefs to the Appeals Board. Not in — not to the lower court. It's brought for the first time here. Yes, but, Orrin, that's always going to be true because it's a complaint about the BIA doing something. Now, this case is sort of strange because it was running around in circles, but I don't know where that provides an obligation of him on his part to exhaust to the BIA what the BIA did. This is asking the Board to make a determination about what its standard of review is. That was never done in prior proceedings. That's what he's asking now, the interpretation of one. Ordinarily. Okay. I'm sorry. If there had been only one go-around, which was ordinarily the case, right? Right. If there — if he had been able to, which he was not, to take a petition for review from the first decision in which the BIA did this, he could just have done that, right, because the BIA made the fact-findings when they weren't supposed to make the fact-findings, so you don't — and we have case law saying you don't have to exhaust what the BIA — something that the BIA did for the first time, right? I mean, is that much true? Imagine — imagine — Am I right about that so far? I'm not entirely sure because I'm not entirely sure I understand the question. All right. Suppose we hadn't had three — three rounds of this. We'd had only one. Okay. And in the first round, the BIA says with regard to the brother's death that they don't think the brother was really killed for reasons having to do with — and whatever they — more than — and at the time, time of Hoots had been disbanded and so on, which was — which were facts that were not — which they seem to be finding de novo with that regard to what the — the IJ have found. Respectfully, that's not what they did. Well, just assume it. Just assume it. Assume that for now, okay? Just assume it. Assume that's what happened, right? And then if they had — if that had been the end of the road and they had come to this court, either it had been a — the issuance of an order of removal at that point and they had come here, there would be no obligation to raise that issue with the board because the board just did it itself and you can't go — and the exhaustion requirement is to exhaust what the IJ does to the BIA, not what the BIA does to itself. Respectfully, think about it like this. Suppose I came before this court and said — and I lost a case, which may very well happen, but — and I lost a case and I said, I don't think this court applied the right standard of review, okay? And it — and I went to the Supreme Court and I — and I made this argument before the Supreme Court without ever bringing it to this court. Exactly. You could definitely do that. You could do that. Absolutely. You have no obligation to file a petition for a re-hearing. Absolutely you could do that. But wouldn't the Supreme Court come and say, you haven't properly brought this again before the Ninth Circuit? Because if something comes up for the first time and when the court of appeals decides something, you go to the Supreme Court with it. No, but I would have to — but I would have to file a panel re-hearing or petition for a re-hearing. Absolutely you're wrong about that. Absolutely not. And again, this is — this is — I'm telling you, you're wrong. You're wrong. Okay? And this is a minor procedural point, but you're wrong. This is, again, an interpretation of the board's standard of review regulation under 1000 — And what you're saying in this kind of instance, that he would have to file a motion to reopen or a motion to reconsider. Absolutely. And again, this wasn't de novo fact-finding to begin with. All right. We can go into that. But as to the question of whether he would have, without this odd set of incidents, had an obligation to go back to the board, the board's own rules say that, and our rules say that. You do not have to go back to the board to file — ask it to reconsider something that it, for its own reasons, did something wrong itself, as opposed to in reviewing with regard to the IJ. Respectfully, you do if it involves an interpretation of the board's regulations so that they can make a decision. All right. But what about the merits of the issue? Again, I don't want to get into the merits because it's really appropriately addressed on remand. Answer the question. Did he engage — did the board engage in improper fact-finding? No. All right. How do you respond to Mr. Job's argument? Well, the board was applying different weight to the evidence. Different weight. Well, why isn't that engaging in fact-finding? Well, again, if the two cases that I submitted with the 28J, matter of ASB and matter of VK, the board talks about its regulations. But if that's the case, I think it would be more appropriate to at the very least issue supplemental briefing on that issue because it's more than I can just go through in, you know, two minutes on oral argument. I mean, that requires — That's seven. Again, it's — if you look at those cases, you know, it's — Well, this issue is — The board has the — This issue is not of that kind. I mean, this issue is just a question of past facts. So the question is, didn't they — why didn't they have to find clear error? Did they find clear error? Did the IJ even decide these questions? Did they find clear error? They're allowed to determine de novo what rises to the level of persecution. But that wasn't what they were doing here. They were saying that the brothers were not, in fact, killed for this reason. They didn't say that. They said there's no evidence to support that this meets the standard. They looked at the same evidence, but they didn't say that the brothers weren't killed. They just said the evidence here doesn't support what's going on. They took the same evidence the immigration judge looked at and said, wait a second, this doesn't rise because the evidence here is insufficient. But then you've eliminated any meaning to the notion that they're not going to review facts because facts are always in the record for some reason. But you can take undisputed facts within a record and the same facts and say, wait a minute, you erred. You can't take as an undisputed fact the fact that this guy, that the Tantan Makus killed this guy, these people. And they said that there was no evidence that they were killed for political reasons at all, even though they were killed inside a political office. They didn't change the facts that were found by the immigration judge. They never said that they weren't killed or weren't. They just said the evidence here doesn't support. And therefore they took it out of the equation when he had put it in the equation. They didn't take it. Well, the board, again, is allowed to determine what weight it affords the evidence in a de novo manner. This really requires supplemental briefing based on these two new cases for the benefit of the court so that the government and the alien can make their full arguments here. This is, again, I'm not going to be. It's a very confusing issue with respect to these two new cases because they're relatively new. The board is interpreting, essentially, it's standard under one. That may be a good idea. Okay, thank you. With respect to, again, exhaustion, here we go. This has been before the board and the immigration judge six times, okay? And for the first time ever now we're saying, wait a minute, we weren't even removable in the first place.  Okay. And, again, with respect, at one point he says that the board mixed up the standard of review, saying that he would be persecuted. He takes out two words from the decision saying would be, but I think it's pretty clear from the decision that the board understood what the proper standard was. That may be. It's not an exhaustion question, but you're probably, I mean, America. Right. That's not an exhaustion question. It's not an exhaustion question for the same reason the other one's not an exhaustion question, which is it's not the board did. And he doesn't have to go back to the board and say, oh, look, you did this wrong. Well. Now Austin said, look, they didn't do it right. It involves an interpretation of the board's regulation, Your Honor. I would respectfully submit that you do have to bring it before the board so that they can make a determination. And with the board standard of review, that's in the regulations. That's not just something that can be determined de novo. The board has to be able to determine it. I mean, the Attorney General has absolute discretion to set up the system, you know, between the board and the immigration judge and interpreting that standard of review. I mean, if they do X, then they're interpreting their regulation to allow them to do X. I mean. Well, the Attorney General has discretion to determine what that standard of review is. And whenever it involves something like that, which is, again, why I really want to go in depth in the supplemental briefing because that's very complicated. You have to go under the Attorney General's preamble in these two cases and talk about the interplay between them. And I'm not going to be able to adequately do it right now. With respect to – I'm trying to – there's so many issues in this case. What am I forgetting? Just a moment. With respect to the finding of past persecution, which he argued about now in the factual basis, that's only in a footnote of his brief. It hasn't been adequately briefed. So we haven't been able to have a chance to adequately brief it in return because that would constitute waiver of waiver. So, again, if that – if this Court were to determine that that were something that needed to be addressed, you know, we would need to – Wait. What's the issue you're talking about now? The question of past persecution as to his complete finding. With respect to his briefing in his opening brief. And we – and that's the last issue in our brief where we specifically say, you know, if it's only addressed in a footnote, that's not sufficient. You have to have citations to controlling law and analysis. So, you know, without – you know, we don't want to waive the issue of waiver there. So that's why we didn't brief it in our brief. Let's see. I know there's more here. Which footnote was that? What's that? That was the last argument of our brief. No, no, no. Which footnote in the blue book? Oh, and that is – I think that's either 28 or – just a minute. One moment. I can cite you the exact page from that. If you find the correct legal standard, no reasonable fact finder could conclude that the evidence does not show the Brazilian to be identified as an heiress to either of those. I'm sorry. It's note 26 on page 42. Note 26. Right. Note 26. Oh, I see. Contrary to the board's finding, the evidence compels the conclusion that Brazilian suffered past persecution on account of his action impeded political opinion as well. It's his family membership. Right. What's your point with that? Well, the whole issue of past persecution there isn't adequately briefed. We need – you know, it has to have citations to controlling law and all that. I mean, we would submit that this issue has been waived because it's not properly addressed, but if the court determines that it is, we'd like an opportunity to brief that. We didn't brief it because we didn't want to waive it. Got it. With respect to the actual board's finding and whether or not it was an error, I think this case is – with respect to the Convention Against Torture claim, I think it's pretty clear based on a matter of J.E., the board's decision, and the reasoning of which was upheld in this circuit's prior decision in Fijian against Gonzalez. The conditions if he were to go back and be placed in prison. Right. I mean, just being a criminal deportee to Haiti is not per se sufficient to establish Convention Against Torture. There has to be some type of individualized analysis. And while I'm not in any way arguing that conditions in Haitian prisons are good, I mean, it's an impoverished country. I expect that they're bad. There's no instance here of – I mean, there's no showing of individualized likelihood of torture at all. And certainly it can't be said that the record compels a contrary conclusion in light of the two decisions there. Again, you know, if you look at some of the facts of this case, I mean, he returned to Haiti three times. Okay. That obviously mitigates any fear of going back. To Haiti. He says in the – Incognito. – which I believe that he was disguised and hidden. Yeah. But he went – he kept going back over and over. I mean, how many – Why he went back? – takes to mitigate something. You know, and again, he was 16 years old. It's been 17 years now. You know, it's a completely different situation. As Your Honor mentioned, the political, you know – you know, Aristide. The Lavalas party is – has, you know – is active in politics. There's no pattern in practice of low-level – there's no showing of a pattern in practice of low-level Lavalas supporters. I mean, it's just not enough evidence to meet that standard there. So unless there's anything this Court has any more questions on, I respectfully request that the Board – that this Court uphold the Board's decision, because it wasn't an error, and that the arguments submitted in Petitioner's brief were either not exhausted, there's no agency decision in the first instance, or were waived. Thank you. I need to make just three points. First, I would ask that the Board uphold the Board's decision.  Third, I would ask that the Board uphold the Board's decision. If we were to send the case back for anything. Pardon me? If we were to send the case back for anything. Yeah. Could the DHS then raise – change country conditions again? They can make a motion. Yeah. I think so. I mean, if you send the case back, I would ask that you ask the Board to – and you're not going to decide that threshold question of burden of proof. I would ask that you tell the Board to publish on this question, and I would ask the Court to retain jurisdiction over this case so that if the Board rules against us, I can come back here more quickly, rather than waiting another four years to get this issue in front of the Court. But presumably, if we did remand, and since one of the grounds for term and error your basic argument would be that they have to meet their burden of termination, they could then have a hearing before the IJ as to whether the current country conditions justify termination. If the Board agrees with us on the burden of proof, then the case is not going to come back to you. If it disagrees and it upholds its decision, you know, its previous decision, then it's probably coming back here. On the issue of exhaustion, I just want to make a few quick points. I mean, first off, you know, we argue that the Board applied an incorrect legal standard using this would be identified rather than could be identified. I mean, this issue was plainly raised with the Board, and this is on page 43, a brief that was filed by the Florence Project with the Board over and over again. The Florence Project argued the Board has noted that an applicant's fear may be well-founded if the persecutor could become aware of the applicant's belief, cites the matter of Mogherabi. It goes on to say the Haitian National Police and other government agents could reasonably determine the applicant's beliefs upon questioning. The respondent, as demonstrated in the record, becomes quite nervous during questioning and could reasonably be expected to reveal this information. Thus, the Board should reconsider its position that the respondent could not be identified as an Aristide or Lavala supporter. The government's just wrong on that. It was raised with the Board. The Board just didn't address it because they didn't have to address it. On this issue about the regulation that requires immigration judges to inform aliens of their apparent eligibility for relief, this is an important question, in my opinion. I mean, obviously, the judge has an obligation to sua sponte, identify forms of relief and inform aliens of their apparent eligibility for those forms of relief. And as this Court pointed out in Moran Enriquez, the purpose of the reg is to ensure that lawyer error doesn't affect the outcome of a case. That also wasn't exhaustive. Pardon me, Your Honor? That wasn't exhaustive either. Well, my point, it goes to exhaustion. And it's our view, and I feel pretty strongly about this, since the purpose of the reg is to prevent attorney oversight, ensure that immigration judges inform attorneys even of their clients' eligibility for relief, this is an issue that the Board has a sua sponte obligation to exhaust on its own. The purpose is to prevent attorneys from missing issues. And if that's the purpose of the regulation, we can't rely on attorneys to raise those issues with the Board. It's perfectly logical. It's not the way I thought it was going to work. That's not the way it works. Right. The Seventh Circuit, if you look at Seventh Circuit law on this point, that Kosovo case that we cite and Asani, they seem to agree with this position. And I think it's exactly right. I mean, it's basically what happens in Rule 11 circumstances before, you know,  I mean, the whole purpose of Rule 11 is to essentially bypass the lawyer, but nonetheless, we apply plain error rules if the lawyer doesn't reach them. And you have the unfortunate circumstance that unlike in district court, you have exhaustion. Exhaustion is jurisdictional. It's not just. If the IJ has an obligation to sua sponte, raise these issues, it's certainly our view that upon review, the Board has that same obligation. That's consistent with the purpose of the regulation. Requiring the attorney who overlooked the issue in the first instance to raise the issue, that would defeat the very purpose of the regulation. So it's our view that the regulation imposes upon the Board itself in reviewing these cases. I mean, in many ways, this is just a classic example of all the things that can go wrong in an immigration case. It's true. Given, you know, the overburdening of counsel and the overburdening of the system and so on. I mean, it appears for many reasons that this person should not be removable. That's true. But it also appears that it wasn't lawyered properly. It wasn't lawyered properly. The Florence Project, you know, they're handling hundreds and hundreds of cases. We're doing this as a pro bono project for them, the Florence Project. But, I mean, if you want to change that system and you want to make that system operate better, you need to read this regulation as imposing that burden upon the Board to sua sponte, raise these issues. Thank you. Thank you. Thank you. Resilien versus Mukasey is submitted. We'll turn to our one criminal case for the day, United States versus Felix Tayabas.
judges: Paez, Berzon, Baer